May it please the court, Robert Swain for appellant Paul Yates. I'd like to split the 20 minutes that we have with co-counsel Gerald Brannan, who represents the appellant in the related case, Mr. McCray. I'd also like to reserve two minutes for rebuttal, and if I don't use my eight minutes, I of course would cede that to co-counsel. Your honors, what I would like to address is the sentencing issues. Now the government has conceded that at a minimum the matter should be remanded for a limited amyline remand because Mr. Yates was sentenced under the belief of the then mandatory sentencing guidelines before Booker and Fanfan. What I'm asking the court and what I've set forth is that the sentence should be vacated and remanded in full for three reasons. Number one, in determining the amount of loss, the court used the wrong standard of proof and in fact came up with an amount that was not correct. Number two, did not fully comply with Rule 32, and number three, imposed restitution in error both because it failed to specify specific victims in specific amounts and because there was no recognition of the ability to apportion the restitution. On that last point, isn't there in the record or somewhere a list of all of the victims? There's somewhere a list, but the order said that it should be administered through the bankruptcy court without specifying any specific amounts to specific individuals. We can't kind of put that together and know that that's what the bankruptcy court will do, is to do it according to the number of victims and what they lost? Well, I think that that's a possibility, but it's not what's required by the Mandatory Restitution Act for that basis and the basis that the court did not recognize its ability to apportion. So you want us to send it back for the district court to say, you've got to apportion it and here's the list of victims? Yeah, well, I think that it should be, well, I want the sentence to be vacated and that would be one aspect of the order would be to comply with the Restitution Act in terms of identifying the victims and making a decision in the first instance of whether the full amount should be apportioned. I don't recall whether it was you or your co-counsel or co-defendant's counsel who raised the issue of whether money had been, if money had been returned or because money had been returned, the forfeiture amount should not include that amount that had been returned to the victims. Are you raising that or only your co-counsel? No, that's not my issue. My issue and the loss amount and the determination by the court is first that the court used a preponderance standard and this is a 16-level increase. The test that the court used is whether the sentencing fact found by the court has an extremely disproportionate impact on the sentence. This raised, there's no case even close that would suggest a 16-level increase is not subject to the higher standard of proof of clear and convincing. This was objected to in the trial court and the trial court specifically said no, it was going to use the preponderance standard. It certainly more than doubled the sentence, even conceding the other three increases. Without the 16-level increase, it would have been an offense level of 12, which carries a 10- to 16-month range. With the 16 levels for the amount of loss, it increases to 78 to 97 months. And I think that for that reason alone, because it was preserved and the court used the wrong standard of proof, the sentence should be vacated for that reason. Unless it's not prejudicial. Correct, but the standard for using the wrong standard of proof of that is whether it's a harmless beyond a reasonable doubt and that's set forth in Jordan. And here, first of all, our position is there weren't sufficient findings to show that Mr. Yates was responsible for the amount taken in during his whole employment. It doesn't make sense to hold him liable for the full amount. That means that for someone who's recruited as a salesman, he answered a newspaper ad to come work for this operation that had already been ongoing. He comes to work there and under the court's ruling, he's liable for every dollar that was raised from the moment he started working there to an operation that looked like, you know, it had an accounts department, it had lawyers, it had people who were working there. It seems unreasonable and unfair for a salesperson who gets recruited through a newspaper ad to be... Right into the whole thing and doing a lot of the explaining, which was tainted with fraud. Well, I think that the nature of the trial, because he was the only salesperson to go to trial, then the government focused on evidence relating to him. But in the big picture, it was Mr. McRae who started the operation, who ran the operation, who was the only person with access to all material relating to the business. I mean, the salespeople didn't interact with the traders. I mean, there was trading going on and Mr. Yates, certainly the evidence showed that, especially towards the end, he was one of the few people that stayed on. He seemed to have a special relationship with McRae. Went on trips with him. Well, he was scheduled to go on a trip with him. He never went on the trip. And so I think that that's a little unfair and it came out that way because he was the only person that went to trial along with McRae. And so the government's evidence focused on witnesses who would have something to say about Mr. Yates. But, you know, there were a lot of salespeople working at the company over a period of time. And I just don't think that it's fair to, without further findings, to consider whether this full amount was reasonably foreseeable to him. Because the government tries to conflate criminal liability under co-schemer theories, for example, under Lyons, with relevant conduct under the guidelines. And the relevant conduct is narrower because it may, it requires a finding by the court that it's reasonably foreseeable and within the joint conduct. And it doesn't seem fair to hold Mr. Yates responsible for the amount from the day that he starts working that other people that he has no idea, has no way of knowing what amounts are being raised. Now, if I could turn briefly to the Rule 32. The one point I wanted to make on that was that the increase for relocation of the operation overseas, that was a plus two under 2F1.1B5A, which was objected to in the sentencing objections. And the court made no specific finding on that. And this is a guideline that requires that the defendant relocated or participated in relocating a scheme with the intent to hide it from law enforcement in some way. There wasn't evidence that Mr. Yates did that. And so the court did not point to any facts or make any specific finding in that regard. I see I've used almost the full eight minutes that I had. And so I'd like to reserve two minutes and thank you. You have used the eight minutes. How much time is your counsel going to take? We were going to split it in half, so I've used eight out of my ten. All right. Thank you. Thank you. Counsel. May it please the Court. I'm Gerald Brannon on behalf of William McRae. I'd like to direct my comments this morning to the violation of McRae's Fifth and Sixth Amendment rights and specifically start with why the district court violated those rights when he denied McRae a timely and meaningful pretrial adversary hearing to determine whether some of his assets should be released to fund his criminal defense. Didn't we just flatly rule on that in the prior appeal? Yeah, I want to address that, Your Honor, right now, and that is why this Court should not apply the law of the case doctrine. I think most importantly – well, for one thing, the law is discretionary. The law of the case doctrine is discretionary. But more importantly, the Monsanto or the adversary hearing issue addressed here is not identical to the issue addressed by the previous panel. This case concerns the $100,000 bond money posted in the Jones case. That was not addressed by Judge Lorenz in the previous case. The previous panel's appeal was from Lorenz's decision. They could really not have decided what Jones did. In fact, it's important. I want to read this quote from Judge Lorenz to emphasize his point. Quote, I believe there is a declaration by Mr. Nielsen in there as it relates to the facts of this case. He does not evaluate the declaration. He says, if you are going to be seeking money from that bond, which I think was $100,000, that came from a bank account that was related to the Judge Jones case. I'm going to refer that matter to Judge Jones. It's his matter. The money is related to an entity that is involved in his case, and I believe any Monsanto hearing should be referred to him. Excuse me. I think for that reason alone that this Court can address the issue here. And the additional reason why this Court may circumvent the law of the case doctrine in this case is the previous panel's memorandum was erroneous. Their findings were erroneous, as it turns out applies to the Judge Jones case, based on the evidence that was presented to Judge Jones. Now, the previous panel held that McRae had failed to support his evidentiary hearing, his request for an adversary hearing with sufficient evidence. Now, we all know that the threshold showing is really low for that, and they also held that he had failed to show that he didn't have other funds with which to fund his criminal defense. Both those reasons are refuted in front of Jones. Number one, McRae's ability to fund his criminal defense with other funds was foreclosed by Judge Burns after Lorenz ruled. When he froze all of his assets... It would be better if you referred to the judges below as judges. I'm sorry, Your Honor? It would be better if you referred to the judges as judges, Judge Jones and Judge Lorenz. Thank you. So Judge Jones was really faced with a different set of circumstances. He was faced with a motion that was supported by a declaration from Mr. Nielsen, who had 33 years of experience working for the IRS in financial criminal investigations. He was very, very experienced. So not only do we have a declaration in support of the adversary hearing request before Judge Jones, we also have definitive proof that McRae didn't have any assets whatsoever to rely on. So the ruling really made those findings, but those findings are refuted in the evidence that was presented to Judge Jones. So for those reasons... Oh, and the final reason, there is one final reason why this court should not apply the law of the case doctrine, and that is to prevent a miscarriage of justice. Lorenz stated that McRae was entitled to an adversary hearing. He looked at the stuff. He decided not to make a ruling on that and to direct the parties to Judge Jones and Judge Miller with respect to the $450,000. But he did state that on the record. Judge Burns actually stated that there was a legitimate issue as to whether McRae could, in fact, hire his own counsel. And the third reason, under the prevent a miscarriage of justice in that context, is that the government really, by its representations to the court and by the positions that it took before the district court, acted to block McRae from getting a hearing, which I've discussed more fully in the supplemental brief.  I think this clearly can reach the issue and should reach the issue because this is an important issue. It's a vital issue in that McRae was, we believe, denied his Fifth Amendment right to a timely and meaningful adversary hearing in order to determine whether the $100,000 or, in fact, any of his other assets that were seized or are frozen by Judge Burns could be made available or should be made available to him to fund his criminal events. In other words, were not seizable by the government. What evidence would you present that these funds were not the source of fraud? Yeah, the first, the most important evidence is the declaration by Mr. Nielsen, which accompanied the motion that was the adversary hearing request that was presented to Judge Jones. That declaration, authored by somebody with a tremendous amount of experience with the IRS and financial criminal investigations, stated that he reviewed the EWI accounts and that the $100,000, in his opinion, was reflected legitimate commission income and, therefore, was not tainted. Now, in my mind, that certainly establishes a triable issue of fact, so to speak. In a situation where the threshold showing is admittedly low, the previous panel did note that, that the threshold showing for an adversary hearing is admittedly low. In my mind, Mr. Nielsen's declaration is more than sufficient to establish that dispute. When you add to that the fact that Lorenz admitted that McCrae was entitled to, I'm sorry, Judge Lorenz, stated in open court that McCrae was entitled to an adversary hearing, that adds up to a quite significant showing, certainly sufficient to meet the low threshold showing that admittedly applies to get an adversary hearing. If you want to save the four minutes, you'd have to stop. Okay. I just want to point out that the other reason that McCrae's rights were violated here in the supplemental brief, which I raised in the supplemental brief, has to do with the fact that the government argued in the district court that the court had, I'm sorry, the government argued before Judge Jones that the court had no jurisdiction to act on the funds because they were in a civil proceeding. And it knew that wasn't correct because it cited the case that holds contrary to that, the Unimex case. Nevertheless, the government representative, Judge Jones, took that position. The government also asserted that McCrae was not entitled to an adversary hearing. This is on May 9th, 2002. It also asserted that McCrae was not entitled to an adversary hearing because his counsel had indicated that he had other funds with which to use to hire counsel. When they knew, the government knew a week before on May 2nd, 2002, the government was at the hearing with Judge Burns and Judge Burns, in response to their indication that they were going to seize all of McCrae's assets, froze everything. So the government knew McCrae had no assets. He was effectively indigent. And by representing that, Judge Jones should not afford him a hearing because he had other funds with which to hire counsel was disingenuous. And then the government also asserted that McCrae had failed to establish a bona fide challenge to the government's civil seizures. Despite the fact that the government admitted to Judge Burns that its pending civil or criminal forfeiture proceedings might not be successful. I think this is a real important admission they make to Judge Burns. Judge Burns put that in the record. And then later, the government agreed to release $80,000 of McCrae's funds that was being held in Milton's trust account to pay his condominium expenses. Now, the government says, well, that was to preserve the assets, so the asset could be sold and then provided to the victims. However, I would like to direct the courts. Counsel, you're using up your co-counsel's time here. Well, could I make one more statement that I would just like to address? These issues are related in terms of the violation of the Sixth Amendment right to counsel. And I feel that Mr. McCrae's case deserved more than 10 minutes. And so I would be requesting some additional time in order just to present, to talk about the substitution of counsel issue as well. Would the court be willing to grant me that? I'm not, but go ahead. It's okay with me. All right. We'll give you another minute. A minute? A minute in addition to the minute you've got. That gives you two. And then we'll give you a co-counsel as rebuttal time. Okay. I just want to say one thing. Well, I'll leave that. I'll have some rebuttal time, will I? No. I won't have any rebuttal. Okay. I just want to direct the court to the sealed excerpts of record, page 54. Excuse me. There's a letter from Knute Johnson to Mr. McCrae. This is dated January 20th, 2005. I also conferred with Faith Devine, the prosecutor in this case, to confirm that she had previously agreed the government would not seize any money that goes back to you that does not exceed $75,000. So the government's statement that, well, the money was all going to go to the victims is not entirely correct. The government was willing to release $75,000 of the sale from the proceeds of the condominium to McCrae, which could have been used to fund his criminal defense. Now, I just want to say, I just want to get to the substitution of counsel issue and emphasize the fact that there was a serious conflict here. Excuse me. And the serious conflict is reflected by most critically by counsel's draft new trial motion before Judge Lorenz, in which he states, and this is in the excerpts, counsel drafting this motion believes that communication with McCrae is broken down to the extent that he can no longer effectively represent McCrae. That's Knute Johnson stating in a draft motion that he made that he can't do it. He can't represent McCrae anymore. So McCrae, and then there's two hearings before Judge Jones. McCrae says, listen, he's not prepared. He says he's not prepared. I'm really worried. I can't proceed with him. In front of Judge Jones on June 17th, which would be the second hearing on the substitution of counsel, McCrae brings up the issues he has with Knute Johnson with respect to the Lorenz case, which is tried first. And in response to that, Johnson says that he asked, that he asked Lorenz to be relieved of counsel in that case. That alone to me establishes a serious conflict which required a serious inquiry by Judge Jones in order to make the determination of whether McCrae should be allowed to substitute Milch in his previous counsel. And the problem is, is the court's inquiry was inadequate. The court merely had two brief hearings and merely was completely focused on the fact that it felt that Mr. Johnson was competent, which is not an adequate reason to deny substitution of counsel, and was concerned with delay. In this particular case, the substitution of Milch, and back in another case, would not have delayed the case one day. He had worked on the case for two years before Mr. Johnson was appointed. He was fully ready and prepared to go, and he had been paid. So the court's reasons were really not sufficient. And for that reason, I think the court abused its discretion in not allowing a substitution. In addition, the inquiries were not substantial enough to account for the seriousness of the conflict that had begun months and months before in the Lorenz case, and had continued up to the point where it was still a problem, and even perhaps more of a problem in Judge Jones's case. McCrae even said that he had been paid. We've given you an extra five minutes, two of your co-counsels, and three minutes over. Okay. Thank you very much. Thank you, counsel. Good morning, Your Honor. Yasmin Saeed from the United States Attorney's Office in Southern District of California. Your Honor, I'm going to be splitting my argument. Co-counsel Ms. Leah Bessel will address the Monsanto issue. Any legal questions you have regarding the restitution order, I can answer any factual questions you have regarding the restitution order since I was trial counsel. Your Honor, to first address the Yates issues, the government does oppose a full remand of the sentencing in this case. To address his first issue regarding loss, the government established a loss of more than $25 million, beyond a reasonable doubt, at trial. IRS Revenue Agent Lee Wright testified to that amount. He provided schedules that contained his analysis, so there was no question that that was the amount of loss that was established at the time of trial. In terms of the preponderance argument, this case is a perfect example of why, in a fraud case, you should look to the Riley case and the fourth factor in the Jordan standard, in the Jordan test, to determine what the proper burden of proof is in a loss analysis of a fraud case. If you look at the fifth and sixth factors, then your analysis becomes skewed because the defendant is able to manipulate the burden of proof simply by proposing an arbitrary loss, which is exactly what happened in this case. If you look at the fifth factor, and as Mr. Swain argued, in their appellate briefs, they're arguing a zero loss in this case to create a 16 to 22 level difference between what the court imposed and what they're now arguing. At sentencing, their loss was arbitrary, but at least they had argued $201,000, and that created a six level difference. At a minimum, in this case, they should have argued what Gates had admitted during the course, what he admitted to IRS agent Lang during an interview in 2000, and he said, at that time, I have managed and solicited $5 million of funds from investors. So if you looked at that minimum loss figure, that would have put the loss at either 13 or 14 from their argument. If you compared it to the 16 levels that the court imposed, that's only a two to three level difference, which falls within the acceptable level that is set forth for the fifth factor, which is four levels or below. The same analysis applies to the sixth factor. You don't have a doubling of the sentence in this case if you use the $5 million loss. If you use a zero loss or a $201,000 loss, which wasn't supported by the record below, you do get a doubling. But if you use the $5 million, you wouldn't, because the court's loss was plus 16. The guideline range from that was 78 to 97 months. If you used a $5 million loss, if the defendant had argued that, the guideline range, if it was a plus 14, would be 63 to 78 months, and if you used a plus 13, it would be 57 to 71. You don't have the doubling effect. And that's why it's so important in these types of cases, and in this case, to look to the totality of the circumstances as articulated in Riley, and you look at the extent of the conspiracy, or in this case, the extent of the scheme. And as alleged in the indictment, the mail and wire fraud counts ran from July 1998 to August 1999, and the indictment itself alleged a $30 million fraud, and the defendant was employed at IFL during that time period. So based on those factors, you should really apply the preponderance of the evidence. And arguing in the alternative, even if the government in the court was wrong, the government still met the higher burden in this case. There was no question, and Yates did not dispute, that the amount solicited from investors while he was employed at IFL was $25 million. Quickly addressing his Rule 32 arguments, Mr. Yates never filed a factual objection to the loss in the lower court. He argued as a matter of law, you shouldn't apply co-scheme or liability, but he never filed a factual objection to the $25 million. He simply said, don't apply the Munoz lines of cases. Find a lesser amount. But he never questioned the calculation of the $25 million. For that reason, the court looks at that for plain error. Even assuming he had filed a factual objection, the court's findings on this point more than satisfied Rule 32. The court found twice on the record that the loss was $25 million and then $20 to $40 million. He said the losses were foreseeable. He found it to be a Ponzi scheme. He found him responsible for co-schemer losses, and he said based on the fact that it was a Ponzi scheme, he wasn't entitled to refunds. Those findings satisfied Rule 32. In addition, the court implicitly adopted the findings of the pre-sentence report and the government's briefs, which was consistent with the court's findings, and the court expressly adopted the pre-sentence report and its written findings, all of which satisfy Rule 32. With respect to his argument regarding the two-level enhancement for relocation to a foreign jurisdiction, once again, the PSR that he objected to, the sentence in the PSR, was that Yanks had not solicited multiple EarthWise investors. He didn't create a factual dispute when he simply denied that fact. The case law is clear in this circuit as well as in other circuits that you have to do more than make a bare-bones denial of something that's contained in the pre-sentence report. You need some type of rebuttal evidence. You testify, you submit a declaration, you call other witnesses. None of that was done in this case. So absent that, there was no Rule 32 factual dispute that the court needed to decide on this point. Assuming again in the alternative, if you find that it was a legal and valid factual dispute, the court, by adopting the pre-sentence report and its written findings, cured any technical violation that could have occurred at the sentencing hearing. And that's established clearly by the Riley case in this circuit. The court obviously had to have overruled Yates' objection on that point in order to apply the two-level enhancement for relocating the fraud to a foreign jurisdiction. So considering all those facts, there was certainly no error on this point. Your Honor, factually in terms of the restitution for Yates, my co-counsel will address any legal questions you have, but there was overwhelming evidence in the record regarding who the victims were, how much they had invested, and how much they had received in refunds. Two witnesses testified to those facts. IRS agent Lee Wright testified to those facts, as well as the bankruptcy examiner Victor Ramsauer. Quickly addressing Mr. McCrae's argument regarding substitution of counsel. Your Honor, as this Court knows, Mr. McCrae is a twice-convicted economic predator. While he was on bond in this case, he committed the fat fraud before Judge Lorenz, for which he was convicted, and he was in the process of committing a third foreign currency trading fraud scam in Australia, defrauding Japanese investors. He has never won the case. He has never once accepted any responsibility for anything he's done. His sole objective has to make the overwhelming evidence of guilt disappear in this case. And so what he's done for purposes of this appeal is he's manufactured this irreconcilable conflict with Knute Johnson, who was his third lawyer after he fired his first two. And if you look at the record in this case, especially pre-trial, all of William McCrae's complaints about Knute center around ineffective assistance of counsel. His primary complaint was that Knute Johnson would not do what he wanted him to do when McCrae wanted it done. And specifically, Knute would not follow McCrae's legal plan or legal advice because Knute Johnson was attempting to protect McCrae from his own self-destruction. And that simply doesn't constitute an irreconcilable conflict that would cause a reversal of the conviction in this case. If you look to the two hearings that counsel talked about pre-trial, the October 3, 2002 hearing, which was held before Judge Jones, as well as the June 17, 2003 hearing, McCrae's complaints, again, were entirely disagreements with Knute Johnson about trial strategy. Not that there was a breakdown in communication, not that there was a collapse in communication. It simply disagreed with the way Knute was handling his case. And Knute Johnson addressed those concerns to Judge Jones. He told Judge Jones at the October 3 hearing, I have time. I have kept notebooks of all the conversations and meetings I have had with McCrae. I have sent another attorney to see McCrae when I've been in trial. At June 17, the 2003 hearing, the same colloquy took place. I have time to spend with Mr. McCrae. I am not too busy. I have spoken to Mr. Milchin, as Mr. McCrae wished. I have two other attorneys helping me on this case. Clearly, that is no record for persuading this court that there was a breakdown in communication between McCrae and his attorney, Knute Johnson. The other thing I'd like to point out to the court, that the record is very misleading with respect to the record he presents on this issue. And I would like to clear up a couple of points. First, he omitted two key documents in his excerpts. One was the May 11, 2004 letter that the government moved to augment the record with last week when we found it. And in it, it shows that McCrae had an ongoing dispute with his attorney, Joe Milchin, who is now claiming he fought so hard to keep into the case. He had an ongoing dispute with him over $80,000 that he believed Milchin had wrongly withheld from him. And he complained to Judge Jones about the $80,000, that Milchin's legal fees were excessive, and he also complained that Milchin was not dispersing those fees pursuant to a court order. So that contradicts totally his argument that he had waived any conflict with Milchin or that he had retracted his prior refusal to waive a conflict with Milchin. Also, what he didn't include for this court was the May 27, 2005 hearing transcript. It was a sealed hearing. Government counsel wasn't present. And the only way we found out about it was if you look to William McCrae's June 22, 2005 letter to Judge Jones, because he references that hearing. And in that hearing, or in that letter, McCrae admits that at that hearing, Knute Johnson admitted to Judge Jones that there wasn't a conflict, and John Lanahan, his advisory counsel, who had been also representing McCrae since January 2005, represented to Judge Jones that there wasn't a conflict. So he doesn't include that transcript to this court, because it obviously undermines and contradicts the position that he's trying to assert at this point on appeal. The other important information you need to know is that he admits or tries to convince this court in at least three different documents that Knute Johnson admitted to a breakdown, primarily prior to the trial, and that's simply not true. One of his documents is a May 14, 2003 FAT motion, which was a motion for a new trial filed in the FAT case before Judge Lorenz. And in that motion, Knute Johnson states, McCrae is alleging that I'm ineffective. Not that there's a breakdown in communication, that I'm ineffective. Importantly, that document was never given to Judge Jones. If you look at the excerpts, there's no record of Judge Jones ever having seen that document. Two other documents that he's alluded to. One is the draft motion for new trial in the FAT case. He misrepresents to this court that that document was prepared by Knute Johnson in May 2003, and Knute says in the document there's been a breakdown. If you read the document, that document was not prepared until after October 28, 2004, after this court affirmed McCrae's convictions in FAT and after the trial in IFL. And importantly, that draft motion was never filed with any court and was never given to Judge Jones until July 2005. And it was prepared at a point prior to the point in time that they had patched up their differences at the May 2005 hearing. How much time do you plan to leave to your co-counsel? I can end at this point, Your Honor. If you don't have any other questions and you don't have a problem with the record on that, I will submit. Good morning, Your Honors. Leah Bussell appearing on behalf of the United States. The government's position with respect to Mr. McCrae's request for a Monsanto hearing is fairly simple. First of all, the principles of collateral estoppel do in fact apply because Mr. McCrae's motions before Judge Lorenz included both the $450,000 and the $100,000. Every time he made a request for a hearing, he wanted all of the money back. And so it was fully and fairly litigated, and the prior panel of this court appropriately decided that he had not met his initial burden of proof. Well, what do we make of the fact that Judge Lorenz said all this stuff before Jones should be decided by Jones, and that's the $100,000, I guess? I think for the court to understand the context in which all of this arose, one would have to know both of the criminal cases were pending before separate district court judges, and both of the civil forfeiture cases were pending before yet two other separate district court judges. And there were pending motions in the two civil cases to join them to one judge, and there were also claimants, victim claimants in both of the civil cases who had already filed claims to the same money that McCrae was trying to get back for payment of fees from victims of his fraud. And I think if you look at the big picture of things, the district court was very concerned that victims' rights be adequately protected at the same time as the defendant's claim any claims to money by the defendant. And I think also at the same time what you had going on was you had repeated representations by McCrae's counsel that he had other money, he had other funds. If the court looks at the record, I can tell you, if you look at Excerpt 53.1, Excerpt of Record 65, and Excerpt of Record 53.9, those are all representations by whichever attorney was then representing McCrae that he had access to other funds. So I think all the district courts were looking at were, he still has access to other funds, we're not going to address the issue when we have victims making claims in all of those cases. The other thing that comes up is Judge Lorenz, obviously the district court judges are very respectful of each other's cases, was aware that Judge Jones had the separate IFL fraud case pending before it, whereas Judge Jones was aware that in the FAT fraud case that Judge Lorenz's victims had received a large part of their monies back, whereas the IFL victims had not. The testimony at trial, and it had appeared in the indictment, were that the IFL victims of the creditors listed in the bankruptcy case, 252 of the 292 creditors listed in the IFL bankruptcy were victims of the IFL fraud. So the courts were very aware that there was going to be a minimum amount of distribution in the IFL bankruptcy case, as opposed to the FAT fraud case where McCrae had been caught, or he knew his criminal activity had been detected, and he was quickly trying to make payments to those victims. So I think that that is what was going on in terms of what the district courts were doing. We also had, pending, the multiple motions by multiple counsel, because as Ms. Sayeds said, Mr. McCrae had separate counsel in each of the cases, and when he would lose a motion, he would replace that counsel. So there was also evidence before the court as to Attorney Milchen that he had received, in his attorney trust account, $750,000, and the government had only seized $450,000 of it, and then there's a subsequent letter by Mr. McCrae stating that he had paid Mr. Milchen $550,000 for a case that hadn't yet gone to trial. So again, against all of that backdrop, I think the courts were very concerned about returning any money to Mr. McCrae. When he had not made a threshold showing, counsel makes a great argument about agent Nielsen, former agent Nielsen's declaration that the $100,000 came from supposedly legitimate funds. However, if you read that declaration, it is only in the last paragraph, and he caveats it with, from the records that I've reviewed, it appears to me that the money may be from Earthwise Investments, and it is a legitimate trading company. The court heard or saw in the declaration in support of the seizure warrant for that money from Special Agent Tim France that that money represented yet fraud proceeds from a third fraud committed by Mr. McCrae via Earthwise International in Australia by the Japanese investors. So this was yet, and it also contradicted representations that Mr. McCrae had made in sealed proceedings regarding the posting of the bond as security for his appearance, where he said it was from a segregated account from legitimate commissions. And against that context, the court found that he had not made a legitimate showing as to any claims to the money. It's also important, if the court is going to look at the request for a Monsanto hearing relative to Judge Jones, that Judge Jones never granted nor denied it. He took it under reservation and directed the counsel bring it back to him when it was ripe for hearing or adjudication. They never did. Counsel tries to say that the government froze additional assets. Those are the only assets the government seized, were the two separate pots of money. Judge Burns was trying to protect the defendant's right to a speedy trial, which we would certainly be before this court had been violated by issuing his freeze order. He never sought any review of Judge Burns' freeze order, nor did he seek to present other assets to either Judge Burns or the district court for unfreezing for purposes of paying counsel. Thank you, counsel. Thank you very much, Ron. You have two minutes. Thank you, Your Honor. Once again, the government is conflating the total amount solicited during the time that Mr. Yates was employed there and saying that automatically is the same as the loss determination. It wasn't proven beyond a reasonable doubt. There was no jury finding on a specific amount, number one. And number two, there wasn't a finding by the jury that that amount was reasonably foreseeable to Mr. Yates. That was a judge-found determination that had an enormous impact on the sentence. The government tries to say, well, there were these different levels, so it really wasn't that much of an increase. But the fact was the defense objected to the 16-level increase. The court specifically found it was only going to use a preponderance of the evidence and then raised the offense level by 16. And so it had an extremely disproportionate impact on the sentence. And it's just the type of sentencing factor that even Post Booker and Fan Fan needs to be determined at a standard of clear and convincing. And there just wasn't the evidence there that it was reasonably foreseeable from the first day that he worked there that all money taken in was lost. Thank you. Thank you, counsel. The case is argued. It will be submitted. The court will stand in recess for the day. Thank you.
judges: B. Fletcher, Reinhardt, Rymer